**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**RUBEN VICTOR CENTENO-BERNUY, et al.,**

                                **Plaintiffs,**                    **03-CV-0457A(Sr)**

**v.**

**DONALD A. PERRY,**

                                **Defendant.**

_____

## REPORT, RECOMMENDATION AND ORDER

        This matter was referred to the undersigned by the Hon. Richard J.

Arcara, in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and

report upon dispositive motions.  Dkt. #60.

        Currently before the Court are defendant's motions to dismiss the

complaint and preliminary injunction[1] (Dkt. ##112 & 118), and plaintiffs' motion for

summary judgment.  Dkt. #114.  For the following reasons, it is recommended that

defendant's motions be denied and plaintiffs' motion be granted in so far as plaintiffs

seek a determination that defendant retaliated against them in violation of 29 U.S.C.

§ 215(a)(3), but denied in so far as plaintiffs seek the remedy of a permanent injunction.

---

[1] Although defendant asks for dismissal of the T.R.O., it is clear to the Court that he is seeking relief from the preliminary injunction entered by the Hon. Richard J. Arcara on December 19, 2003.  Dkt. #59.

## BACKGROUND

The defendant, Donald Perry, is the father of Melinda Vizcarra who, along with her husband, Oscar Vizcarra, operates Becker Farms in Niagara County, New York. *Centeno-Burney v. Becker Farms*, No. 01-cv-839 ("*Becker Farms*"), at Dkt. #71-2, ¶ 1. Becker Farms has been operated as a family farm through four or five generations of the Becker family. Dkt. #33, p.6. Defendant lives on a two-and-a-half acre plot in the middle of the 340 acre farm. Dkt. #33, p.77; *Becker Farms* at Dkt. #71, Exh. M, p.32.

Between 1996 and 2001, the Vizcarras requested permission and were approved to hire non-immigrant foreign workers pursuant to the H-2A program set forth in 8 U.S.C. § 1101(a)(15)(H)(ii)(a). *Becker Farms* at Dkt. #69-3, ¶ 8; Dkt. #71, Exh. D. This program permits agricultural employers to hire nonimmigrant aliens as workers if they first obtain a certification from the United States Department of Labor that there are insufficient domestic workers who are willing, able, and qualified to perform the work at the time and place needed and that the employment of these aliens will not adversely affect the wages and working conditions of domestic workers. See 8 U.S.C. § 1188(a)(1). To ensure that employment of H-2A workers does not adversely affect the wages and working conditions of domestic workers, regulations require that employers compensate H-2A workers at a rate not less than the higher of the federal minimum wage, the prevailing wage rate in the area, or the adverse effect wage rate.[2]

---

[2] The adverse effect wage rate is the minimum wage rate that the United States Department of Labor determines is necessary to ensure that wages of similarly situated domestic workers will not be adversely affected by the employment of H-2A workers. 20 C.F.R. § 655.100(b); 20 C.F.R. § 655.107.

20 C.F.R. § 655.102(b)(9).  Numerous other regulations address, *inter alia*, payment of transportation and subsistence costs, housing, and record keeping.  20 C.F.R § 655.102(b).

The Vizcarras hired four H-2A workers each year from 1996 through 2001.  *Becker Farms* Aff. of Oscar Vizcarra, dated 4/29/2005, ¶ 3.[3]  Plaintiff Ruben Centeno-Burnuy was hired to work at Becker Farms as an H-2A worker during the 1997 through 2001 growing seasons.  *Becker Farms* at Dkt. #69-3, ¶ 2; Dkt. #71-2, ¶ 9.  Plaintiffs Waldo Centeno-Burney and Joel Efrain Pecho-Vivanco were hired to work at Becker Farms as H-2A workers during  the 1998 through 2001 growing seasons.  *Becker Farms* at Dkt. #69-3, ¶ 3; Dkt. #71-2, ¶ 9.  Plaintiff Aquiles Galindo-Buendia was hired to work at Becker Farms as an H-2A worker during the 2000 and 2001 growing seasons.  *Becker Farms* at Dkt. #69-3, ¶ 4; Dkt. #71-2, ¶ 9.  Plaintiffs were recruited from Peru because that is Oscar Vizcarra's country of origin.  *Becker Farms* at Dkt. #71-24, pp. 2 & 4.

Plaintiffs started speaking with Farm Workers Legal Services late during the 2000 season and, upon their return to Becker Farms in the Spring of 2001, maintained their own log of hours worked during the season.  *Becker Farms* at Dkt. #79-6, pp.10-13; Dkt. #79-8, p.7.  They left Becker Farms on November 3, 2001, ten days prior to the expiration of their H-2A contract and planned return to Peru.   The

---

[3] Although the Court received a courtesy copy of this document, it does not appear to have been electronically filed.

Vizcarras informed the former Immigration and Naturalization Service ("INS"), and the

New York State Department of Labor of plaintiffs' absence on November 7, 2001. Dkt.

#5, Exh. 6. On November 12th or 15th, defendant also called the INS with respect to

plaintiffs, but made no claims that the plaintiffs were a danger to national security. Dkt.

#5, Exh. 3; Dkt. #9, ¶ 20; Dkt. #34, pp.116-18.


Plaintiffs filed a civil action alleging violations of, *inter alia*, the Fair Labor

Standards Act ("FLSA"), against Becker Farms and Oscar and Melinda Vizcarra on

November 28, 2001. *Becker Farms* at Dkt. #1. Defendant became aware of the lawsuit

on November 28 or 29, 2001. Dkt. #33, p.77.


On December 3, 2001, defendant contacted Stephen Truong of the INS

and "revealed to him the organization that had aided and abetted these illegal aliens in

absconding from Becker Farms." Dkt. #5, Exh. 3; Dkt. #9, ¶ 20; Dkt. #34, p.118. By

letter dated December 3, 2001, Patricia Kakalec, counsel to Farmworker Legal Services

of New York, Inc., advised the defendant that Special Agent Steven Truong of the INS

had informed her that defendant had advised the INS that plaintiffs were in the country

without proper authorization. Dkt. #5, Exh. 1. Ms. Kakalec advised the defendant that

his communication with the INS about plaintiffs was retaliatory and warned that

Farmworker Legal Services would pursue legal remedies to prevent and redress such

retaliation. Dkt. #5, Exh. 1. At that point, defendant "started realizing that there was

something very strange going on" and "that these men are here for no good" and "are

sympathizers of the terrorists Luminoso." Dkt. #34, pp.119 & 125-26.

By letter sent via facsimile to Ms. Kakalec on December 4, 2001,

defendant reported that

> Today, 12-3-01, two events happened in my life that amazed me no end.  As you are aware the United States, following the events of 9-11-01 in NYC, has declared war on terrorists world wide, including aliens who remain in this country illegally and cause economic distraction to private business and create fear and distrust in the community of their residency.  Such terrorist [sic] have been characterized by the Attorney General of the United States as "sleepers," "aliens who come to this country legally for several years, blend in with the community, become respected by their employers and neighbors and then rise up from some inner anger and create chaos among those who have befriended them, attempting to destroy the American way of life and the tranquility of community."
>
> On November 3rd or 4th I was made aware that such an event was occurring in my own family.  Four H-2A workers under contract at Becker Farms had disappeared in the middle of the night, "Puff!!"  With out [sic] so much as a goodby [sic] or explanation.  These men were daily participants in my family's life, invited to all family festive occasions such as my grandchildren's birthday parties, etc.  They were trusted by me and all of my family members.
>
> * * *
>
> It was only later that I learned that he delivered a subpoena issued by your law firm stating that the Becker Farms H-2A workers were known to you.  Of course, I immediately thought of the INS and the fact they had encouraged me to report to them any clues to the whereabouts of the men.  On Dec 3rd, 01 I went to the INS office in Buffalo and met with Special Agent Steven Thuong [sic] and refered [sic] him to your office.
>
> * * *
>
> You state that my "communication with the INS about your clients was clearly retaliatory" and my name therefore will be added to your offices [sic] lawsuit against Becker Farms.
>
> As a patriotic American citizen in this time of war I deeply resent your charges.  The Attorney General of the United

States has enlisted all citizens in reporting acts of aliens which may be disruptive to the economic well being and tranquility of our community.

Dkt. #5, Exh. 3.


During 2002, plaintiff appeared on a local radio station, WBL1340 in Lockport, and accused an employee of Rural Opportunities, Inc., Flor Aber, of working with illegal aliens and being protected by the United States Attorney and the New York State Attorney, and expressed his concern that the Vizcarra's were danger of expending "several hundreds of thousands of dollars to answer these charges." Dkt. #5, Exh. 5.


By letter dated March 2, 2003, defendant informed New York Assistant Attorney General P. Smith that

Trafficking in illegal aliens appears to be alive and well in NY State farm worker programs and your Labor Bureau appears to be involved.

My name is Donald Perry and I'm sure you will recall my conversation with you Friday afternoon, 2-28-03, regarding your Bureau's charges against me and Becker Farms for retaliation against four illegal non-immigrant H-2A workers who absconded from their place of employment on Becker Farms in the middle of the night on 11-2-01 and have been working illegally in the USA at non-agricultural jobs all the while being aided and abetted by FLSNY & ROI.

You indicated that someone complained to your office about me and its my impression that was FLSNY. It was their impression that I was wrong in suggesting that these four illegal aliens were believers in the tenets of international terrorists "sleeper cell" activities, aided and abetted by FLSNY/ROI.

Dkt. #5, Exh. 2.

By letter dated April 16, 2003, plaintiff informed the Court of his belief that

The biggest threat to our society today is not from terrorists from Iraq or Afghanistan, our biggest threat today is from the Western Hemisphere terrorists, illegal aliens flooding across our border by the thousands per day overwhelming our long established immigration laws and border patrols, aided and abetted by such organizations as FLSNY (Farmworker Legal Services of New York) and ROI (Rural Opportunities Inc.).

Eight weeks after the horrendous tragedy of 9-11-01, four non-immigrant aliens absconded in the middle of the night from their place of employment in Niagara County, lock, stock and barrel, three weeks before they were to return to their homeland. They were aided and abetted by FLSNY/ROI to go underground, to live and work as fugitives as millions of illegal aliens have done before them.

These men, sympathizers with the International Maoist Terrorist of Sendaro Luminosa of Peru, were raised to despise the rules and laws of their Federal Government and continue today to also despise the laws of the United States by their illegal actions against the US Dept. of Homeland Security (DHS).

When they were approached by Flor Aber of ROI, five and a half years ago (1998) and she offered to help them establish a terrorist "sleeper cell" in Niagara county, and eventually the opportunity to turn on their employer and "jump ship" some day, they revered Ms. Aber as an angel from heaven.

Ms. Aber became their "Mule," an unauthorized outreach worker from ROI in violation of Clearance Order J00142495 (2001). Her job, as she saw it was to "lift the fence" to enable these poor, down trodden, poverty stricken, pathetic, scum of society from the Latino Countries of her heritage, to illegally flood New York State with her Ilk, bringing down our economy to that of a third world nation and creating the lawlessness of the "Shining path." . . . .

Dkt. #5, Exh. 4.[4]

---

[4] The Court could not begin to count the number of letters it has received from defendant during the course of this litigation which express sentiments similar to those set forth above.

On June 16, 2003, plaintiffs filed this action alleging that defendant

engaged in retaliation in violation of the anti-discrimination provisions of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), and the Migrant and Seasonal

Agricultural Worker Protection Act ("AWPA"),[5] 29 U.S.C. § 1855, by contacting the New

York State Department of Labor, INS, New York State Police, United States Attorney,

United States Department of Homeland Security ("Homeland Security"), and other law

enforcement agencies to falsely accuse plaintiffs and the organizations assisting them

of being terrorists.  Dkt. #1.  Plaintiffs sought a temporary restraining order and

preliminary injunction to prohibit defendant from continuing his retaliatory actions.

Dkt. #2.

Defendant admits that he contacted the New York State Police, United

States Attorney General John Ashcroft, Homeland Security, and United States

Department of Labor, among others, but denies doing so with any retaliatory intent.

Dkt. #9, ¶ ¶ 21 - 23.  In his answer, defendant states that

> Defendant Perry, upon exhaustive research and prolonged
> discussion with many contacts has concluded these illegal
> alien plaintiffs are sympathizers of the International Maoist
> Terrorist Organization known as the Sendero Luminosa and
> have formed their own "sleeper cell" in the United States
> along with others.  Defendant Perry, upon exhaustive
> research has concluded that FLSNY, et. al have and are
> operating as an alien smuggling ring, smuggling, aiding,
> abetting and harboring illegal aliens.

Dkt. #9, ¶ 24.

---

[5] Plaintiffs have abandoned their AWPA claim.  Dkt. #114-9, p.2. n.3.

At the outset of the preliminary injunction hearing, defendant explained that he contacted the INS on November 15, 2001 and was informed that they could not proceed against the plaintiffs without knowledge of the plaintiffs' whereabouts. Dkt. #33, p.12. Upon receipt of the lawsuit, defendant decided that plaintiffs' counsel, Farmworkers Legal Services, knew where the plaintiffs were residing and returned to the INS with that information. Dkt. #33, p.12. Defendant also expressed concern that the Becker Farm litigation

> will bankrupt the farm. It's estimated to be in excess of four hundred thousand dollars in charges.

Dkt. #33, p.12. Defendant further opined that

> we're here today because I have pursued an investigation of the trafficking and smuggling of illegal aliens into New York State by the Farmworkers Legal Services. And I have accumulated a tremendous amount of evidence indicating who acted as the mule, who acted as the coyote in this particular case – those are terms used in smuggling . . . aliens – and we have those names. And they, because they have declared war on the H-2A program nationally and in New York State, they have been brazen enough to bring a case against me and against Becker Farms in the name of these illegal aliens – now illegal – men without a country. And asking the Court to bankrupt Becker Farms.

Dkt. #33, p.19.

On July 28, 2003, defendant sent a letter to Homeland Security Undersecretary Asa Hutchinson advising that

> Trafficking in and smuggling of sympathizers of the Sendero Luminoso is alive and well here in New York State, aided, abetted and harbored by a coalition of forces including the Farmworkers Legal Services of New York (FLSNY), Rural Opportunities Incorporated (ROI) and Cornell University Migrant Program.

Dkt. #28.  At a continuation of the hearing on August 6, 2003, defendant reiterated that

> Trafficking in smuggling of aliens is illegal.  These four
> nonimmigrant aliens enlisted, if you will, in the H-2A
> program, and pledged to obey the laws of the United States.
> It turns out that these men from Huancayo, Peru, are
> Sandonista – Sandorista sympathizers of the al Qaeda-
> linked Maoist international terrorist organization known
> worldwide as the Sendero Luminoso, a/k/a Shining Path,
> with the aid of Rural Opportunities, Inc. . . . they established
> a sleeper cell in the backyard of my home, with the
> assistance of . . . Farmworker Legal Services.

Dkt. #34, p.99.


When asked for any evidence that supported his opinion that plaintiffs

were terrorists, defendant informed the Court that plaintiffs

> were born into the Sendero Luminoso environment and
> culture in Huancayo and Huancayo vicinity, including
> Ayacucho and that area of Peru, high in the Andes. . . . As if
> they were orientals, they can't deny that they're not
> sympathizers of the Sendero Luminoso.

Dkt. #34, p.132.  When questioned further, defendant testified that he

> was aware of the activities of the Sendero Luminos/Shining
> Path in Lima – in Peru.  And these people came from the
> area, the hot bed of the Sendero Luminoso in the Andes
> Mountains of Peru.  So it was only a natural conclusion on
> my part that we have a very serious problem here. . . .
> Which was reinforced when the lawsuit was published . . .
> Because it was obvious that they had been working with the
> Farmworkers Legal Services clandestinely, and Rural
> Opportunities, Inc. clandestinely, without the knowledge of
> their New York State rural representative of the H-2A
> program . . . .

Dkt. #34, p.139.

The district court entered a preliminary injunction against defendant by Decision entered December 18, 2003. Dkt. #59. In its Decision, the court found

> that Perry's claims that plaintiffs are terrorists are baseless and that he has known from the outset that they were baseless. He has asserted these sensational yet unfounded claims to government authorities for the sole purpose of preventing or dissuading plaintiffs from pursuing the Becker Farms litigation. Both the timing and nature of Perry's accusations support such a finding. Before the Becker Farms litigation was filed, Perry had already reported the plaintiffs to the INS and knew that the INS was not going to make a special effort to find them. He never mentioned anything regarding terrorism to the INS during this initial contact. He made the sensational allegations regarding terrorism to the INS and other government agencies only after he learned of the Becker Farms litigation. He admits that he has no evidence to support these allegations. It is clear that he was simply trying to take advantage of the government's concern about terrorism following the tragic events of September 11, 2001 to prod the INS and other government agencies into making a more serious attempt to locate and deport the plaintiffs, thus making it more difficult for them to pursue the Becker Farms litigation. At the hearing, Perry expressed concern that the Becker Farms litigation may result in Becker Farms having to declare bankruptcy and him losing his home. This concern is the true motivation behind his actions.

Dkt. #59, pp.6-7. The Court restrained and enjoined defendant, in pertinent part,

> from contacting or communicating with, in any way, any local, state or federal government official or agency, including but not limited to the United States Attorney General, the United States Attorney, the New York State Attorney General, the United States Department of Labor, the New York State Police, the INS, the United States Department of Homeland Security, and the United States State Department, with regard to the plaintiffs . . . .

Dkt. #59, pp.20-21.

By Notice of Motion filed March 12, 2004, plaintiffs moved the Court for a finding of contempt of the preliminary injunction following defendant's contact with, *inter alia*, the New York Assistant Attorney General C. Michael Higgins on February 26, 2004. Dkt. #64. Upon review of the motion papers and the prior proceedings, the district court referred the matter to the United States Attorney for investigation and possible prosecution for criminal contempt. Dkt. #88, p.8. Defendant was charged with violating 18 U.S.C. § 401(3), and convicted of contempt on December 28, 2007. *United States v. Perry*, 04 Misc. Cr. 111. Dkt. #114, Exh. L.

On June 8, 2004, defendant again contacted Assistant Attorney General C. Michael Higgins regarding Farmworkers Legal Services and, after Mr. Higgins advised defendant that he should not be communicating with him and hung up the telephone, defendant called back and left Mr. Higgins a voice mail message accusing him of being "part of the conspiracy . . . with Farmworkers Legal Services in their efforts to smuggle illegal aliens into the country." Dkt. #114-3.

In February of 2005, the defendant discovered Flor Aber's new place of employment and called her there multiple times a day for several weeks, despite her request that he cease calling. Dkt. #114, Exh. B. Defendant also called Ms. Aber's boss and told her that Ms. Aber was sympathetic to migrant farm workers; dangerous; a Communist; and involved with terrorist activities. Dkt. #114, Exh. B & C. Defendant accused Ms. Aber of being a "mule" and trafficking illegal aliens and of bringing the individuals responsible for the September 11, 2001 terrorist attacks into this country.

Dkt. #114, Exh. B.  In 2005, when the telephone company inadvertently published Ms.

Aber's previously unlisted telephone number, defendant called Ms. Aber at home and

continued his allegations.  Dkt.#114, Exh. B.  In May of 2005, defendant appeared at

Ms. Aber's place of employment and asked to see her.  Dkt. #114, Exh. B.  After Ms.

Aber changed her home phone number, defendant began contacting Ms. Aber's in-laws

seeking her new telephone number.  Dkt. #114, Exh. B.  Defendant obtained Ms. Aber's

home telephone number through some other means, and telephoned every day for two

months.  Dkt. #113, Exh. B.


On January 26, 2009, the Becker Farms litigation was resolved by

settlement.  *Becker Farms* at Dkt. #175.


## DISCUSSION AND ANALYSIS

**Federal Cause of Action**

Defendant argues that the complaint must be dismissed because H-2A

non-immigrant alien contract workers have no private right of action before the federal

courts.  Dkt. #112.  However, "it is well established that the protections of the Fair Labor

Standards Act are applicable to citizens and aliens alike and whether the alien is

documented or undocumented is irrelevant."  *In re Reyes*, 814 F.2d 168, 170 (5th Cir.

1987), *cert. denied sub nom. Griffin & Brand of McAllen, Inc. v. Reyes*, 487 U.S. 1235

(1988).  Thus, the Court of Appeals for the Eleventh Circuit has recognized that "[t]he

protections of the minimum wage provisions of the FLSA indisputably apply to the [H-

2A] Farmworkers." *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1235 (11th

Cir. 2002), *citing* 20 C.F.R. § 655.103(b) ("During the period for which the temporary

alien agricultural labor certification is granted, the employer shall comply with applicable

federal, State and local employment-related laws and regulations . . . ."); *see also*

*Castellanos-Contreras v. Decatur Hotels, LLC*, 559 F.3d 332, 336 (5th Cir. 2009) (H-2B

guestworkers are entitled to FLSA protection).


## 29 U.S.C. §  215(a)(3)

Defendant argues that the complaint should be dismissed because he is

not an agent of Becker Farms and has never owned or operated Becker Farms.  Dkt.

#112.  Plaintiffs seek summary judgment on their claim of retaliation pursuant to the

FLSA.  Dkt. #114-9.


The sole cause of action remaining against defendant in this action is that

he violated the anti-discrimination provision of the FLSA, which provides that it shall be

unlawful for any person --

> to discharge or in any other manner discriminate against any
> employee because such employee has filed any complaint
> or instituted or caused to be instituted any proceeding under
> or related to this chapter, or has testified or is about to testify
> in any such proceeding . . . .

29 U.S.C. § 215(a)(3).  The FLSA defines person as, *inter alia*, "an individual."  29

U.S.C. § 203(a).  Thus, Mr. Perry is an appropriate defendant pursuant to the anti-

discrimination provision of the FLSA.

"At the summary judgment stage, courts address FLSA retaliation claims under the familiar 'burden-shifting' framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), for the analysis of claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*." *Torres v. Gristede's Operating Corp*., No. 04 Civ. 3316, 2008 WL 4054417, at *16 (S.D.N.Y. Aug. 28, 2008). As a result,

> In order to establish a prima facie case of retaliation under the FLSA, a plaintiff must show: (1) participation in protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. The burden of proof at the prima facie stage is *de minimis*. If the plaintiff meets this burden, the defendant must offer a legitimate non-retaliatory reason for its actions. If the defendant puts forth such a reason, the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is mere pretext for retaliation.

*Id.* at *17 (internal citations omitted).

Plaintiffs engaged in statutorily protected activity when they commenced litigation against their employer, Becker Farms, and its operators, Oscar and Melinda Vizcarra on November 28, 2001. No. 01–CV-839 at Dkt. #1. Thus, the first element has been satisfied.

With respect to the second element, the protection afforded by the anti-discrimination provision of the FLSA extends to employees who have voluntarily

terminated their employment before filing a complaint.  *Dunlop v. Carriage Carpet Co.*,
548 F.2d 139, 147 (6th Cir. 1977);  *Contreras v. Corinthian Vigor Ins. Borkerage, Inc.*,
103 F. Supp.2d 1180, 1185 (N.D.Cal. 2000); *see Pantchenko v. C.B. Dolge Co., Inc.*,
581 F.2d 1052, 1055 (2d Cir. 1978).  Moreover, "baseless claims or lawsuits designed
to deter plaintiffs from seeking legal redress constitute impermissibly adverse retaliatory
actions, even though they do not arise strictly in an employment context."  *Torres v.
Gristede's Operating Corp.*, No. 04 Civ. 3316, 2008 WL 4054417, at * 17 (S.D.N.Y.
Aug. 28, 2008), *citing Bill Johnson's Rest's., Inc. v. NLRB*, 461 U.S. 731, 740 (1983).
A defendant maintains no right to make false statements or petition government
agencies to pursue baseless litigation.  *Bill Johnson's Rest's, Inc.*, 461 U.S. at 743.
Thus,  reporting an illegal alien to government authorities; informing a prospective
employer that an employee had filed a complaint with the Department of Labor;
interfering with a former employee's opportunities for future employment; and initiating
groundless counterclaims have all been found to violate the anti-retaliation provisions
set forth in 29 U.S.C. § 215(a)(3).  *See Torres,* 2008 WL 4054417, at *17-18; *Singh v.
Jutla*, 214 F. Supp.2d 1056, 1059 (N.D.Cal. 2002); *Contreras*, 25 F. Supp.2d 1053.


        In the instant case, it is clear that the defendant engaged in an
employment action disadvantaging plaintiffs when he reported the plaintiffs to the INS,
Homeland Security and the New York State Attorney General's Office, accused the
organizations and individuals seeking to assist plaintiffs of harboring terrorists, and
continued such accusations even after being enjoined from any further contact or
communication with government officials regarding plaintiffs.

With respect to the third element, the timing of and lack of factual basis for defendant's accusations establishes the requisite causal connection. Plaintiffs worked for Becker Farms for between two and five years without accusation; were considered "family" by the Vizcarra's; were welcomed at family gatherings; and were recruited specifically from Peru because that is Oscar Vizcarra's country of origin. Dkt. #5, Exh. 3; *Becker Farms* at Dkt. #71-22, pp.32-33; Dkt. #71-24, pp. 2 & 4. It was only after defendant became aware of the lawsuit against his daughter and son-in-law and its potential to bankrupt Becker Farms that he expressed any concern that plaintiffs' continued presence in the United States represented a danger to national security. Dkt. #5, Exh. 5; Dkt. #33, p.19. The lack of support for such accusations is clear from defendants' own testimony which demonstrates that the foundation of his "opinion" is nothing more than his own prejudice. Dkt. #34, pp. 132 & 139.

Defendant has not come forth with any non-retaliatory basis for his actions. Given the lack of factual support for his accusations, defendant cannot claim any legitimate concern for national security. The Court can discern no rationale for defendant's behavior other than a desire to attract the attention of government authorities to locate and deport plaintiffs so that they could not prosecute their FLSA claims against his daughter, son-in-law, and Becker Farms. Defendant's continued telephone calls and correspondence with organizations and individuals perceived to have assisted plaintiffs further supports the conclusion that defendant was intent upon disrupting plaintiffs' ability to pursue their lawsuit. The *in terrorem* effect of defendant's actions upon plaintiffs and the organizations seeking to enforce the FLSA on behalf of

claimants such as plaintiffs is patent.  As a result, the Court recommends that plaintiffs'

motion for summary judgment be granted in so far as plaintiffs seek a determination

that the defendant retaliated against them in violation of 29 U.S.C. § 215(a)(3).


**Remedies**

Plaintiffs seek to make permanent the preliminary injunction previously

ordered by the district court.  Dkt. #114-9, p.2.  In the event that the Court denies their

request for a preliminary injunction, plaintiffs reserve the right to seek other forms of

relief available under the FLSA, including damages.  Dkt. #114-9, p.2, n.2.


The standard for a permanent injunction is the same as that for a

preliminary injunction, except that the plaintiffs must establish actual success, rather

than merely a likelihood of success on the merits.  *Lusik v. Village of Cold Spring*, 475

F.3d 480, 485 (2d Cir. 2007).  However, because an injunction is a matter of equitable

discretion, a permanent injunction does not follow a preliminary injunction after success

on the merits as a matter of course.  *Winter v. Natural Resources Defense Council,*

*Inc.*, __ U.S. __, 129 S.Ct. 365, 381 (2008).  Thus, plaintiffs must establish: (1)

irreparable injury; (2) remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) considering the balance of hardships

between the plaintiffs and the defendant, a remedy in equity is warranted; and (4) that

the public interest would not be disserved by a permanent injunction.  *eBay Inc. v.*

*MercExchange L.L.C.*, 547 U.S. 388, 391 (2006).

In granting plaintiffs' motion for a preliminary injunction, the district court determined that defendant's allegations "negatively affects plaintiffs' ability to enforce their rights under the FLSA" and "have also caused potential witnesses . . . to be reluctant to testify."  Dkt. #59, p.12.  At this point, however, plaintiffs have resolved their FLSA claims against Becker Farms.  As a result, it is the opinion of this Court that a permanent injunction is unnecessary.  Therefore, it is recommended that this request for relief be denied.

## CONCLUSION

For the reasons set forth above, it is recommended that defendant's motion to dismiss the complaint and preliminary injunction (Dkt. ##112 & 118), be denied and plaintiffs' motion be granted in so far as plaintiffs seek a determination that defendant retaliated against them in violation of 29 U.S.C. § 215(a)(3), but denied in so far as plaintiffs seek the remedy of a permanent injunction.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this

Report, Recommendation and Order in accordance with the above statute,

Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments,

case law and/or evidentiary material which could have been, but were not presented to

the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v.*

*Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an

extension of such time waives the right to appeal the District Court's Order.  *Thomas v.*

*Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*,

838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local

Rules for the Western District of New York, "written objections shall specifically identify

the portions of the proposed findings and recommendations to which objection is made

and the basis for such objection and shall be supported by legal authority."  Failure to

comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of

Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report,

Recommendation and Order), may result in the District Judge's refusal to consider the

objection.

The Clerk is hereby directed to send a copy of this Report,

Recommendation and Order to plaintiffs' attorney and to the defendant.


**SO ORDERED.**


DATED:     Buffalo, New York
           July 14, 2009


                              **s/ H. Kenneth Schroeder, Jr.**
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**